**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

CALVIN SUTTON,

        Plaintiff,

v.                                                                                                          ACTION NO.
                                                                                                            2:04cv472

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.


**UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff brought this action under 42 U.S.C. § 405(g) and 42 U.S.C. §1383(c)(3) seeking judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits under Title II of the Social Security Act.

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.

The Court recommends that the final decision of the Commissioner be AFFIRMED.


**I.  PROCEDURAL BACKGROUND**

On August 26, 2002, Calvin Sutton ("Mr. Sutton") filed an application for disability insurance benefits with the Department of Health and Human Services of the Social Security

Administration. (R. 46-48).[1]  He alleged an onset of disability as of April 6, 2002 due to right shoulder rotator cuff surgery. (R. 46, 74). This application was denied by the Social Security Administration initially and on reconsideration. (R. 29, 30).

Mr. Sutton requested a hearing before an Administrative Law Judge ("ALJ") of the Social Security Administration which was held on August 7, 2003. (R. 310-25). He was represented by Gregory Camden, Esq. at the hearing, where Mr. Sutton and a vocational expert testified.

On October 10, 2003, the ALJ issued a decision finding Mr. Sutton was not entitled to disability benefits because he was not under a "disability" as defined by the Social Security Act. (R. 12-22). The ALJ found he is capable of performing his past relevant work as a lasher and as a hatch boss, and alternatively is capable of performing a full range of light work. (R. 21). The Appeals Council of the Office of Hearings and Appeals of the Social Security Administration denied review of the ALJ's decision on June 25, 2004. (R. 4-6). This makes the ALJ's decision the "final decision" of the Commissioner subject to judicial review here, pursuant to 42 U.S.C. § 405(g).

Mr. Sutton brought this action seeking review of the Commissioner's decision denying his claim for disability insurance benefits. He filed a complaint on August 9, 2004, which the defendant answered on October 25, 2004. Mr. Sutton filed a Motion for Summary Judgment on December 29, 2004, and Defendant filed a Motion for Summary Judgment on January 28, 2005.  As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for decision based on the memoranda.

---

[1] "R." refers to the administrative record.

## II. FACTUAL BACKGROUND

Mr. Sutton was a 53 year old man at the time of the hearing in this matter. (R. 314). Born June 3, 1950, he is presently fifty-four years old. (R. 46). He graduated high school, and his past relevant work experience[2] includes thirty years working as a longshoreman. (R. 314). As a longshoreman, Mr. Sutton testified he worked primarily as a lasher, responsible for tightening the containers down on the ship so the containers will not move. (R. 316). This would require lifting turnbuckles and rods. Mr. Sutton testified he was required to lift between 100 and 150 pounds, and was required to climb ladders. (R. 317). Mr. Sutton injured his right shoulder while working as a lasher on May 17, 1999. (R. 157, 318).

The day he suffered his shoulder injury, Mr. Sutton went to Urgent Care where he received Ibuprofen and Skelaxin. (R. 176). The next day, he was seen by Mary Graham, M.D. with Urgent Care, who prescribed Motrin, Flexeril at bedtime, Skelaxin during the day, and physical therapy. (R. 176).

Thereafter, Mr. Sutton began seeing Sheldon M. Cohn, M.D., Orthopaedic Associates of Virginia, for treatment of his shoulder. (R. 166-69, 318). Dr. Cohn completed a physical abilities form on May 26, 1999, indicating Mr. Sutton was restricted from climbing ladders, crawling, using vibratory tools or working above his shoulders, and was limited to lifting 30 pounds. (R. 168). Dr. Cohn performed an arthroscopic subacromial decompression with an open distal clavicular resection on Mr. Sutton on August 6, 1999. (R. 157).

Mr. Sutton began physical therapy at the Norfolk Physical Therapy Center on August 11,

---

[2] Past relevant work experience is defined as substantial gainful activity in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. § 416.965(a); 20 C.F.R. § 404.1565(a).

1999, and attended 54 sessions over a period of 6 months. (R. 165).

On December 17, 1999, Mr. Sutton presented to Dr. Cohn complaining of weakness and pain, mainly in the AC joint area, and with overhead motions of his shoulder. (R. 167). Dr. Cohn noted Mr. Sutton's motion was "quite guarded." He administered a steroid injection without much change in Mr. Sutton's symptoms. Dr. Cohn referred Mr. Sutton to Norfolk Physical Therapy Center for work conditioning, and a functional capacity evaluation concurrent with validity testing.

A functional capacities evaluation was completed on December 29, 1999, by physical therapist Susan McGann. (R. 157-64). Ms. McGann recommended Mr. Sutton return to work at the light to medium work level. She found Mr. Sutton was capable of lifting 40 pounds and carrying 29 pounds in the right hand. She further found Mr. Sutton could reach above shoulder height occasionally, but should avoid sustained, repetitive, or weighted reaching with the right arm above shoulder level. She reported Mr. Sutton was malingering during the majority of his tests. Further, his alleged "pain and disability were not in proportion to his movement patterns . . .." (R. 159).

Mr. Sutton returned to light duty work as a hatch boss in January 2000. (R. 318-319). He testified that a hatch boss is essentially a supervisory position, but he also was required to lift cables, boards and plywood. (R. 318).

On January 19, 2000, Mr. Sutton went to see Dr. Cohn, complaining of "achy pain, mainly around his AC joint area and anteriorly." (R. 166). Dr. Cohn continued Mr. Sutton's work restrictions, presumably this refers to the restrictions ordered May 26, 1999, from climbing ladders, crawling, using vibratory tools, working above his shoulders, or lifting over 30 pounds. Dr. Cohn referred Mr. Sutton to Dr. Carr for a second opinion, and ordered an MRI. The MRI was performed on January 21, 2000, and indicated Mr. Sutton was suffering from rotator cuff tendinosis "without

4

evident tear." (R. 169).

Mr. Sutton was seen by Daniel E. Carr, M.D., Virginia Orthopedics and Sports Medicine, P.C., on February 7, 2000. (R. 229). Dr. Carr recommended another subacromial injection, with reassessment in two weeks. On February 21, 2000, Dr. Carr restricted Mr. Sutton to light work (R. 228), and further restricted Mr. Sutton to sedentary work on April 10, 2000. (R. 225-26). Dr. Carr performed a second arthroscopy on Mr. Sutton's right shoulder on May 3, 2000. (R. 223). One week after this surgery, Mr. Sutton reported he already felt better than before the surgery. (R. 222). Mr. Sutton had a range of motion almost to 90 degrees, which Dr. Carr felt was "actually quite good." Dr. Carr referred Mr. Sutton to physical therapy.

On June 12, 2000, Dr. Carr's examination revealed Mr. Sutton had no aching pain, his range of motion was close to full, although with pain on forward flexion and overhead motion, and his strength was returning. (R. 220). Dr. Carr released Mr. Sutton to perform a supervisory position, though restricting him to lifting ten pounds. (R. 221). Mr. Sutton testified that he returned to work in June 2000, and worked for about a year. (R. 319).

On July 17, 2000, Dr. Carr reported Mr. Sutton was making "good progress," was "more active with his arm," and was "markedly improved," but should continue with the current restrictions. (R. 218-19). On October 2, 2000, Dr. Carr released Mr. Sutton to work as a hatch boss with no lifting over 40 pounds, no reaching above shoulder height, and climbing only ladders. (R. 212). Dr. Carr stated Mr. Sutton had reached maximum medical improvement, and had an 8% impairment to his right upper extremity. In May and October of 2001, Mr. Sutton reported to Dr. Carr with increasing shoulder pain and aching. (R. 202, 203). Dr. Carr recommended ice, heat, and an occasional anti-inflammatory. (R. 203).

Mr. Sutton was out of work for a couple of weeks in June of 2001, to rest his shoulder, and returned to work again on August 27, 2001, for another year. (R. 320).

In July of 2002, an MRI showed "significant scarring and evidence of inter substance tearing of the subscapularis tendon." (R. 199). Dr. Carr recommended a third arthroscopic surgery, and restricted Mr. Sutton to lifting no more than 5 pounds with no overhead activity. (R. 198). In August of 2002, Dr. Carr stated that these work restrictions were permanent. (R. 196).

Mr. Sutton testified that the last job he performed was as a hatch boss in August of 2002. (R. 315, 321). In a questionnaire he signed on August 26, 2002, Mr. Sutton indicated that this job began July 30, 2002, and ended on August 3, 2002, with the last day of work taking 13 hours to finish the job. (R. 84-88).

In a daily activities questionnaire dated November 3, 2002, Mr. Sutton indicated that he does light gardening, prepares his own meals, does laundry and light dusting, and goes shopping. (R. 90-91). For recreational and social activity, he fishes once a month for one or two hours, reads the Bible, and visits relatives twice a week. (R. 92-93). He also takes care of children, parents and an aunt, taking them to the doctor and driving them to stores. (R. 93). He attends church every week. (R. 94).

Based on Mr. Sutton's medical records, a State Disability Determination Services (DDS) physician, Michael Cole, D.O., completed a Residual Physical Functional Capacity Assessment of Mr. Sutton on January 8, 2003. (R. 233-40). He found Mr. Sutton was capable of lifting and carrying 10 pounds frequently and 20 pounds occasionally. He could stand or walk for six hours in an eight-hour day and could sit for six hours in an eight-hour day.

Dr. Carr performed a third arthroscopic surgery on Mr. Sutton's right shoulder on February

18, 2003. (R. 290). During Mr. Sutton's follow-up visit on February 25, 2003, Dr. Carr noted Mr. Sutton was "doing well," and referred him to physical therapy. (R. 298-99). On March 10, 2003, Mr. Sutton reported he was doing well, but had some tenderness at night. (R. 296). On June 3, 2003, Mr. Sutton reported increased pain for the past two days, some stiffness and popping. (R. 292). He was given a refill of his Percocet prescription for pain. (R. 292).

On March 6, 2003, a State Disability Determination Services (D.D.S.) physician, Carolina B. Longa, M.D., reviewed the record, and agreed with the earlier Residual Physical Functional Capacity Assessment. (R. 240). She stated that record did not support Dr. Carr's restriction of Mr. Sutton to lifting no more than five pounds with no overhead work activity. She notes Mr. Sutton has good use of his left hand and arm, and has no limitations in sitting, standing or walking.

On July 30, 2003, Dr. Carr completed a Physical Capacities Evaluation for Mr. Sutton. (R. 308-309). He stated Mr. Sutton was limited to lifting 5 pounds, and was impaired in his use of his hands for repetitive reaching, handling, and keyboarding. Mr. Sutton testified at his hearing in August of 2003, five months after this surgery, that he was still hoping to see some improvement in his shoulder from the surgery. (R. 319).

Robert Edwards, a vocational expert, testified at Mr. Sutton's hearing that most longshoremen do heavy, unskilled work. (R. 324). He further testified that the only skills he would consider transferable from work as a longshoreman would transfer to the medium level and nothing to the light or sedentary exertional levels. He acknowledged that plaintiff's counsel mentioned in a letter (R. 108) that the job of hatch boss would be light and skilled under the Dictionary of Occupational Titles (DOT). (R. 324).

### III. ANALYSIS

The ALJ held that Mr. Sutton was not under a disability within the meaning of the Social Security Act. The Court's review of this decision is limited to determining whether there is substantial evidence in the administrative record to support the Commissioner's decision. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)). It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

In reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The denial of benefits will be reversed only if no reasonable mind could accept the record as adequate to support the determination. Richardson, 402 U.S. at 401.

Under Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir. 1984), a denial of benefits is not supported by substantial evidence if the ALJ "has not analyzed all evidence and . . . sufficiently explained the weight he has given to obviously probative exhibits." The issue before this Court, therefore, is not whether Mr. Sutton is disabled, but whether the Commissioner's finding that Mr. Sutton is not disabled is supported by substantial evidence and was reached based upon a correct

application of the relevant law. See id.

The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under Title II of the Act as the

> inability to do any substantial gainful activity[3] by reason of any medically determinable physical or mental impairment[4] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. § 423(d)(1)(A). To meet this definition, the claimant must have a "severe impairment"[5] which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.[6] 20 C.F.R. § 404.1505(a); see also

---

[3] "Substantial gainful activity" is work that (1) involves doing significant and productive physical or mental duties and (2) is done (or intended) for pay or profit. 20 C.F.R. § 404.1510; 20 C.F.R. § 416.910. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572.

[4] "Physical or mental impairment" is defined in section 223(d)(3) of the Social Security Act, Title 42 U.S.C. § 423(d)(3), as an impairment that results from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."

[5] The regulations define a severe impairment as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities . . . ." 20 C.F.R. §§ 404.1520(c), 416.920(c).

[6] The Administration may satisfy its burden by showing that considering the claimant's residual functional capacity, age, education and work experience, the claimant is either disabled or not disabled based on medical-vocational guidelines, or "grids," published at 20 C.F.R., Pt. 404, Subpt. P, App. 2. However, technical application of the grids is not always appropriate, and thus the Commissioner must rely on the testimony of a vocational expert to determine whether an individual claimant is in fact capable of performing substantial gainful activity available in significant numbers in the economy. 20 C.F.R. § 416.920(f); § 404.1520(f);

42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment which prevents past relevant work, and (5) has an impairment that prevents him from any substantial gainful employment. An affirmative answer to question one or negative answers to questions two or four result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920.

In this case, the ALJ addressed all five phases of the five-step evaluation process. The ALJ first determined that Mr. Sutton has not engaged in substantial gainful activity since April 6, 2002. (R. 16). The ALJ next found that Mr. Sutton has a medically determinable impairment that causes right shoulder pain, and which causes significant vocationally relevant limitations and would be regarded as "severe" under the relevant guidelines. (R. 17). However, at the next step of the sequential analysis, the ALJ found that Mr. Sutton's impairment did not meet or equal any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4 (or 20 C.F.R., Part 404, Subpart P, Appendix 1). (R. 17). Fourth, based on the ALJ's evaluation of the evidence, the ALJ determined

---

Heckler v. Campbell, 461 U.S. 458, 466 (1983); SSR 83-10.

Mr. Sutton's residual functional capacity.[7] (R. 17-18). The ALJ found that the evidence and testimony, as a whole, reflect that Mr. Sutton

> has the residual functional capacity to perform the following activities: lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting for about 6 hours in an 8-hour workday; and standing or walking for about 6 hours in an 8-hour workday. (R. 18).

The ALJ found Mr. Sutton retains the residual functional capacity to perform his past relevant work as a lasher as he performed it in the past or as a hatch boss as that work is generally performed in the national economy. (R. 19). Therefore, he is not under a disability.

Alternatively, the ALJ found that if Mr. Sutton is not able to perform his past relevant work, he retains the ability to perform jobs other than his past relevant work considering his age, education, past work experience, and residual functional capacity. 20 C.F.R. § 404.1520(f). At this final step, the burden shifts to the Commissioner to demonstrate other jobs that Mr. Sutton would be able to perform. See Heckler v. Campbell, 461 U.S. 458, 460 (1983).

The ALJ found Mr. Sutton's residual functional capacity, age, education, and work experience allowed him to perform all activities required by "light" work. Therefore, the existence of occupations in the national economy is met by administrative notice. See Soc Sec Rulings 83-11

---

[7] Residual functional capacity is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing residual functional capacity,

> the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.

Id. (footnote omitted.)

and 83-10. The ALJ concluded that Mr. Sutton could make an adjustment to other work and was, thus, not disabled. (R.20).

Mr. Sutton argues that the Commissioner's decision is not supported by substantial evidence because the Commissioner improperly rejected the testimony of the treating physician, and improperly found Mr. Sutton was able to work a forty-hour week as a hatch boss.

### A. ALJ's Evaluation of the Treating Physician's Opinion

First, Mr. Sutton claims the ALJ failed to give proper consideration to the opinion of his treating physician, Dr. Carr, that Mr. Sutton is restricted to lifting no more than five pounds.

Applicable regulations provide that a treating source's[8] opinion on issues regarding the nature and severity of an impairment should receive controlling weight if it is not inconsistent with other substantial evidence in the record and is well supported by medically-accepted clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1526(b); 404.1527(d)(2); 416.927(d)(2).[9] In addition, the ALJ is required to explain the weight given to any of the medical opinions that bear on the issues in

---

[8]As defined in 20 C.F.R. § 404.1502 ". . . a treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)."

[9]The Fourth Circuit's treating or attending physician rule as presented in published opinions predating the regulation hold that the medical opinion of a treating physician is to be given great weight and may be disregarded only if there is persuasive contradictory evidence on the record. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987); but see Craig, 76 F.3d at 590 (explaining that if a treating source's opinion is "not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight").

the case.[10]

The ALJ did consider the treatment notes and opinions of Dr. Carr. (R. 17-18). The ALJ made the following observations and conclusions:

> In March 2001, Dr. Carr noted that the claimant was doing "reasonably well" in a supervisor's job but as noted above, the claimant retired in June 2002. The claimant's treating physician indicated that he could not lift over 5 pounds but he does not provide an explanation for this conclusion or cite specific objective findings to support that limitation. . . . It may be reasonable to conclude that the claimant was unable to lift more than 5 pounds immediately following surgery, but the record does not show that he has been incapable of lifting more than 5 pounds for a continuous period of at least 12 months. In addition, there is no objective evidence supporting the limitation Dr. Carr cites regarding the repetitive use of the claimant's hands. Therefore, I give minimal weight to the finding of the treating physician regarding the severity of the limitations cause by the claimant's impairment (SSR 96-2p).

(R. 18).

A review of the record reveals that less than 10 days following his shoulder injury, Mr. Sutton was released to work, although he was restricted from climbing ladders, crawling, using

---

[10] "Unless the treating source's opinion is given controlling weight, *the administrative law judge must explain in the decision the weight given to the opinions* of a State agency medical or psychological consultant or other program physician or psychologist, *as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us*." 20 C.F.R. § 404.1527(f)(2)(ii) (emphasis added).
However, the Social Security Regulations specifically state that the final responsibility for deciding certain issues, such as whether the claimant is disabled, what the claimant's residual functional capacity is, or the application of vocational factors, is reserved to the Commissioner. "We will not give any special significance to the source of the opinion on [these issues]." 20 C.F.R. § 404.1527(e)(2), (3). In determining such issues, the ALJ must "review all of the medical findings and other evidence that support a medical source's statement that you are disabled. . . . We use medical sources, including your treating source to provide evidence, including opinions, on the nature and severity of your impairment(s)." Id.

vibratory tools or working above his shoulders, and was limited to lifting 30 pounds. (R. 168). On December 29, 1999, seven months following Mr. Sutton's shoulder injury, and five months following his first surgery, he was released to light to medium work. At that time, Mr. Sutton was capable of lifting 40 pounds, of carrying 29 pounds in the right hand, and of reaching above shoulder height occasionally. He was found to be malingering on his tests, and his alleged "pain and disability were not in proportion to his movement patterns."

Mr. Sutton returned to light duty as a hatch boss in January of 2000. Dr. Carr restricted Mr. Sutton to light work in February of 2000, and to sedentary work in April of 2000, prior to performing a second arthroscopic surgery in May of 2000. Dr. Carr released Mr. Sutton to a supervisory position lifting no more than 10 pounds one month following surgery, and Mr. Sutton again returned to work as a hatch boss, a position he occupied for the next two years. In October of 2000, five months after his second surgery, Dr. Carr increased the weight Mr. Sutton was permitted to lift up to 40 pounds.

After reviewing a new MRI in July of 2002, Dr. Carr restricted Mr. Sutton to lifting no more than 5 pounds. Further, Dr. Carr recommended a third arthroscopic surgery. Despite Dr. Carr's findings, Mr. Sutton was able to work as a hatch boss from July 30, 2002 through August 3, 2002. This included a 13-hour day on August third to finish the job.

Following Mr. Sutton's first two surgeries, Dr. Carr increased the amount of weight Mr. Sutton could lift to forty pounds within five to seven months after the surgery. However, Dr. Carr opined in August of 2002, merely one month following Mr. Sutton's third surgery, that the work restriction of lifting 5 pounds was permanent. This was despite his statement when recommending the surgery that it may, "allow [Mr. Sutton], one a more effective workload and the ability to do more work and two, a comfort level he does not currently have." (R. 199). Dr. Carr does not explain

14

why he was able to determine one month after the third surgery that this restriction would be permanent. No objective findings were given to support the restriction.

In addition, Mr. Sutton filled out a daily activities questionnaire in November of 2002, stating he does light gardening, prepares his own meals, does laundry and light dusting, goes shopping, fishes once a month, visits relatives twice a week, takes care of children, parents and an aunt, and attends church every week. (R. 90-94).

The ALJ sufficiently explained why Dr. Carr's opinion regarding Mr. Sutton's abilities was only given minimal weight. There is no evidence in the record to support the five pound weight restriction. Conversely, the evidence in the record, including the objective medical findings and subjective reports of Mr. Sutton, supports the ALJ's conclusion that Mr. Sutton is capable of lifting and carrying ten pounds frequently and 20 pounds occasionally.

### B. ALJ's Findings Regarding Past Relevant Work

Next, Mr. Sutton asserts the evidence in the record does not support the ALJ's finding that he was capable of working a forty-hour week as a hatch boss. Mr. Sutton argues in his memorandum that while performing the work as a hatch boss, he was required to lift 100 pounds on occasion. He does not cite to the record, so it is impossible to know what evidence he is relying upon to make this assertion. However, based on this representation about his past experience as a hatch boss, Mr. Sutton concludes the position is not "light" in exertion.

Mr. Sutton's counsel does not dispute that the occupation of hatch boss is defined in the Dictionary of Occupational Titles as light in exertion. (R. 108). The argument appears to be that the job, as performed by Mr. Sutton in the past, is not light in exertion. However, the Social Security regulations define past relevant work as either work "as the claimant actually performed it or as

generally performed in the national economy." 20 C.F.R. § 404.1560(b)(2). Therefore, the ALJ appropriately relied upon the Dictionary of Occupational Titles' classification of hatch boss as a job requiring light exertion when ruling that Mr. Sutton was capable of performing the job of hatch boss.

There is significant evidence in the record to support the ALJ's finding and the Commissioner's decision that Mr. Sutton is not disabled.

## IV. RECOMMENDATION

For the foregoing reasons, the Court recommends that the final decision of the Commissioner be AFFIRMED.

## V. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within ten (10) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and

recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984), cert. denied, 474 U.S. 1019 (1985); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

/s/
Tommy E. Miller
United States Magistrate Judge

Norfolk, Virginia

May 31, 2005

## **CLERK'S MAILING CERTIFICATE**

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

Gregory E. Camden, Esq.
Montagna, Klein & Camden, L.L.P.
425 Monticello Ave.
Norfolk, VA 23510


Anita K. Henry, Esq.
Office of the United States Attorney
101 West Main Street
Suite 8000
Norfolk, VA  23510

                                              Elizabeth H. Paret, Clerk


                              By _____
                                  Deputy Clerk

                                    May           , 2005